MARY D. HATCH et al., as Executors of MARY D. SANFORD, Deceased, Appellants, *v*. THE FOURTH NATIONAL BANK of the City of New York et al., Respondents, and JAMES H. FAY, Appellant.

1. BANKS — APPLICATION OF CHECKS DEPOSITED BY CUSTOMER — CONVERTED SECURITIES. When a bank in good faith; in the ordinary course of business and without notice, receives from a customer checks of third parties, obtained from them by his unlawful pledge of securities as collateral to loans made by them, which checks, under a continuing express agreement with the customer to that effect, are applied in payment of an existing indebtedness against him in favor of the bank, the bank is not liable to refund the amount to the owner of the securities so pledged, even though it is sufficiently identified as the proceeds of said securities, and the customer at the time of depositing the checks did not specially direct their application upon his liability to the bank, and at the time of its application the bank had knowledge that he had made a general assignment for the benefit of creditors.

*American Sugar Ref. Co.* v. *Fancher* (145 N. Y. 552); *Van Alen* v. *American Nat. Bank* (52 N. Y. 1), distinguished.

2. CONVERTED SECURITIES — IDENTIFICATION. When, however, converted securities or their avails can be traced into an account or property owned by the wrongdoer, the owner may follow them and recover the same or their value.

Reported below, 82 Hun, 515.

(Argued June 6, 1895; decided October 8, 1895.)

APPEALS by the plaintiffs and defendant Fay from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December

14, 1894, which affirmed a judgment in favor of defendants entered upon a decision of the court dismissing the complaint upon the merits, on trial at Special Term.

This action was originally brought by Mary D. Sanford, since deceased, and revived in the name of her executors, to recover from the defendant, the Fourth National Bank of the city of New York, a portion of the sum of $20,000 alleged to have been the proceeds of a negotiable stock certificate belonging to plaintiff, unlawfully converted by the firm of Mills, Robeson & Smith to its own use, and deposited to its credit in said bank, and also to have determined the rights of other parties to the balance of said sum.

The firm of Mills, Robeson & Smith was a customer of the Fourth National Bank, from which on April 17, 1890, it borrowed $50,000, giving a note therefor secured by collaterals. This note provided that the bank should have a lien for the loan, and for all other liabilities of the maker to it, upon any securities left with it by the maker, and upon any balance of its deposit account with the bank, and further authorized the bank at any time to apply to the payment of any liability of the maker any moneys at any time on deposit to its credit, and also the proceeds realized from the sale of such collateral securities. Thereafter the said firm borrowed from the bank a further sum of $5,000, giving therefor a note secured by collaterals and containing similar provisions. On November 14, 1890, plaintiffs' testatrix delivered to said firm for safe-keeping a certificate of Adams Express Company stock, then worth $15,000. One of the members of the firm unlawfully took this certificate and obtained upon the same, together with other securities which had been forged, a loan of $20,000 from the defendants Ferris & Kimball. The check given by them for the sum thus borrowed was deposited to the credit of said firm in the said bank.

The defendant James H. Fay, on July 2, 1890, also left with said firm for safe-keeping a negotiable railroad bond, and on November 15, 1890, a check for $400, to be collected for his account.

24

On November 14, 1890, said firm borrowed from Hotchkiss & Co. $10,000, giving its note therefor and depositing certain securities as collateral, among them Fay's bond; the check received therefor was also deposited in said bank and credited to its account. On November 15, 1890, said firm wrongfully deposited Fay's check in said bank, which was also credited to its account and paid to the bank after the assignment hereinafter referred to.

On November 7, 1890, Fay left with said firm another negotiable bond, which on that day it fraudulently pledged with said bank as collateral to said loans.

Prior thereto the defendant Georgiana L. Crabb left with said firm for safe-keeping 100 shares of stock, and five bonds, which, on November 7, 1890, it also wrongfully pledged with said bank as collateral to said loans.

November 15, 1890, the said firm made a general assignment, having in said bank on that day, with a check afterwards collected, a balance of $16,520.77.

On or before November 17, 1890, the bank demanded payment of the aforesaid loans, and in default thereof charged the amount due on them to Mills, Robeson & Smith. This was done before the bank had notice or knowledge that any of the parties to this action, other than the firm and its assignee, claimed to have any interest in the securities or in the amount to the credit of the firm.

The bank afterwards sold all the collaterals, pledged as security for said notes, except the bond owned by defendant Fay; the amount realized from the sale, together with the cash balance to the credit of the firm, after deducting its indebtedness to the bank, produced a surplus of $2,334.19.

Among the securities sold by the bank were those belonging to the defendant Crabb, and by the judgment she was awarded said surplus.

The judgment also awarded to the defendant and appellant Fay the bond in possession of the bank remaining unsold.

It was also adjudged that, as against the bank, the plaintiff was not entitled to recover any sum.

Further facts are stated in the opinion.

*George W. Wingate* for appellants. The General Term was in error in holding that the plaintiffs were not entitled to claim that the $20,000 in question did not include the proceeds of Mrs. Sanford's stock. (*McNeil* v. *T. N. Bank,* 46 N. Y. 325; *Fairbanks* v. *Sargent,* 104 N. Y. 108–117; *N. Bank* v. *Hubbell,* 117 N. Y. 395; *Newton* v. *Porter,* 69 N. Y. 133; *Taylor* v. *Plumer,* 3 M. & S. 562; *Stephens* v. *Bd. of Education,* 79 N. Y. 193; *T. Bank* v. *Merritt,* 1 Paige, 302; *M. Bank* v. *Levy,* 3 Paige, 606; *Haddon* v. *Lundy,* 59 N. Y. 320, 329; *Barry* v. *Lambert,* 98 N. Y. 300, 305; 123 N. Y. 272; *Knatchbull* v. *Hallett,* L. R. [13 Ch. Div.] 696; *Baker* v. *Bank,* 100 N. Y. 31; *N. Bank* v. *Ins. Co.,* 104 U. S. 54; *Pennell* v. *Deffell,* 4 De G., M. & G. 372; *Holmes* v. *Gilman,* 138 N. Y. 369.) The transactions of Mills, Robeson & Smith with the defendants Fay and Crabb do not affect plaintiffs' right to claim that the deposit of $20,000 consisted of the proceeds of Mrs. Sanford's stock. (*In re Hallett,* L. R. [13 Ch. Div.] 696; *I. & T. Bank* v. *Peters,* 123 N. Y. 272; *C. D. Co.* v. *McLean,* L. R. [9 C. P.] 692; *Van Allen* v. *A. N. Bank,* 52 N. Y. 1; *Calvin* v. *Gleason,* 105 N. Y. 261; *Dows* v. *Kidder,* 84 N. Y. 121.) The special contract contained in the notes held by the bank only varied from a general banker's lien in that it permitted the bank to assert such lien, although the indebtedness might not be due at the time of the assignment; which could not be done under a banker's lien. (*Jordan* v. *N. S. & L. Bank,* 74 N. Y. 473; *Beckwith* v. *Union Bank,* 4 Sandf. 604.) The courts below were in error in deciding that the bank was authorized, after it was informed of the failure and assignment, to appropriate the money standing to the credit of Mills, Robeson & Smith to pay its previously contracted debt, although such money was the proceeds of stolen property, and is now claimed by its true owner. (*Bay* v. *Coddington,* 20 Johns. 636; *Hall* v. *Wilson,* 16 Barb. 548; *Butler* v. *Harrison,* Cowp. 567; *Wood* v. *B. Bank,* 129 Mass. 358; *C. N. Bank* v. *Diefendorf,* 123 N. Y. 199; *Falkland* v. *S. N. Bank,* 84 N. Y. 145;

*Van Alen* v. *A. N. Bank*, 52 N. Y. 1; *Overseers* v. *Bank*, 2 Gratt. 544; *Frith* v. *Cortland*, 2 H. & M. 417; *Randel* v. *Brown*, 12 How. [U. S.] 406; *Comstock* v. *Hier*, 73 N. Y. 269; *Hoffman* v. *Connor*, 76 N. Y. 121; *Baumann* v. *Post*, 16 Daly, 385; *Speights* v. *Hawley*, 39 N. Y. 441; *Jordan* v. *N. S. & L. Bank*, 74 N. Y. 389; *Barnet* v. *Brandow*, 6 M. & G. 630; *Collins* v. *Martin*, 1 B. & P. 648; *Lawrence* v. *S. Bank*, 5 Conn. 521; *N. Bank* v. *Ins. Co.*, 104 U. S. 54; *Raynes* v. *Dumont*, 130 U. S. 354; *McBride* v. *F. Bank*, 26 N. Y. 450; *C. Bank* v. *M. Bank*, 3 Keyes, 337; *Mayor, etc.*, v. *Heidelbach*, 123 N. Y. 332.) The defendant, Georgiana Crabb, has no claim upon the funds in controversy. (*Sillcocks* v. *Gallaudet*, 66 Hun, 523.) Defendant Fay is entitled to the $400 check collected and deposited by the firm as his agents on the day of the failure and not paid to the bank until the next day. The court, on motion, would require a receiver to return this to the true owner. (*St. L. & S. F. R. R. Co.* v. *Johnson*, 133 U. S. 566; *I. & T. Bank* v. *Everett*, 4 N. Y. Supp. 601; *Beal* v. *City of Somerville*, 50 Fed. Rep. 647; *S. N. Bank* v. *Cumming*, 18 S. W. Rep. 115.) Plaintiff's contention that she is authorized to claim the moneys deposited in the Fourth National Bank as the proceeds of her property is supported by the decisions of this court. (*A. S. R. Co.* v. *Fancher*, 145 N. Y. 552; *Roca* v. *Byrne*, 145 N. Y. 182.)

*David Willcox* for the Fourth National Bank, respondent. The facts regarding the dealings of Mills, Robeson & Smith with the certificate of stock of the Adams Express Company establish no cause of action against the bank. (*Justh* v. *Bank*, 56 N. Y. 478; *Bank* v. *Lloyd*, 90 N. Y. 530; *Cragie* v. *Hadley*, 99 N. Y. 131; *People* v. *S. N. Bank*, 77 Hun, 159; *Hutchinson* v. *Co.*, 9 Misc. Rep. 344; *N. B. & D. Bank* v. *Hubbell*, 117 N. Y. 395; *Groat* v. *Walsh*, 81 Hun, 457; *Falkland* v. *Bank*, 84 N. Y. 145, 152; *Baker* v. *Bank*, 100 N. Y. 31, 34; *Straus* v. *Bank*, 122 N. Y. 379, 382; *N. Y. B. Co.* v. *Higgins*, 79 Hun, 250; *I. & T. N. Bank* v. *Peters*, 123

N. Y. 272; *N. Bank* v. *Ins. Co.*, 104 U. S. 54; *Raynes* v. *Dumont,* 130 U. S. 390; *Barnett* v. *Brandao*, 6 M. & G. 630; *School Dist.* v. *Bank,* 102 Mass. 174; *Wood* v. *B. Bank,* 129 Mass. 358; *Gordon* v. *Kearney*, 17 Ohio, 572; *Bank of Met.* v. *Bank*, 1 How. Pr. 234; *Sweeny* v. *Easter*, 1 Wall. 166; *McBride* v. *F. Bank*, 29 N. Y. 450; *G. Bank* v. *Penfield,* 69 N. Y. 502; *Stephens* v. *Board*, 79 N. Y. 183; *G. Bank* v. *State,* 141 N. Y. 379; *Thompson* v. *S. N. Bank,* 113 N. Y. 325; *Southwick* v. *Bank*, 84 N. Y. 420; *Newhall* v. *Wyatt,* 139 N. Y. 452; *A. P. Co.* v. *C. I. Co.*, 7 Misc. Rep. 509.)

*Henry H. Man* for defendant Crabb, respondent. The balance remaining in the hands of the bank was proceeds of the securities of the defendant Crabb, and traceable as such in equity. The $20,000 check deposited by Mills, Robeson & Smith, November 14, 1890, was neither proceeds of Mrs. Sanford's securities nor traceable after deposit in the bank. (*Stephens* v. *Bd. Ed.*, 79 N. Y. 183; *G. N. Bank* v. *State,* 141 N. Y. 379; *Bank of B. N. A.* v. *M. Bank,* 91 N. Y. 106; *Calvin* v. *Gleason*, 105 N. Y. 256.) The pledge of the deposit account was of equal force with the pledge of the securities, and it follows that Mrs. Crabb has an equitable right to insist that the entire deposit account be applied by the bank in payment before any resort is made to her securities. (*Bank of Met.* v. *N. E. Bank*, 1 How. [U. S.] 239; *Sillcox* v. *Gallaudet*, 66 Hun, 522.) The plaintiffs can derive no possible advantage from the position that the conversion of their testratrix's securities by Mills, Robeson & Smith was felonious. (Penal Code, §§ 528, 533.)

.FINCH, J. We ought to affirm this judgment upon a single ground, which rests upon facts not at all controverted or in dispute. For that purpose we may assume, as true, the plaintiff's version of what actually occurred, without criticism at doubtful points of the way. She was the owner of a certificate of stock of the Adams Express Company, of the par

value of fifteen thousand dollars. That certificate, in a nego-
tiable form and capable of transfer by delivery, she intrusted
to the temporary custody of Mills, Robeson & Smith. Her
son and agent, E. S. Sanford, placed it in a sealed envelope,
marking it on the outside with his name, and left it with
the firm to be placed in their safe until the following Mon-
day. On the day of that deposit, the firm, acting through
Smith, borrowed of Ferris & Kimball the sum of twenty
thousand dollars, giving the note of the partnership therefor,
and depositing as collateral the certificate which the plaintiff
had committed to the care of the firm, and which Smith
converted to its use. We may admit that his act was,
in substance, a larceny, and the certificate in his hands
stolen property, but, nevertheless, the title of Ferris &
Kimball to the pledged certificate which they sold upon
default in the payment of the loan, and to the pro-
ceeds of such sale, is not here and now questioned or
assailed. The plaintiff's certificate was but a part of the col-
lateral which stood as security for the note. It is found that
eight shares of Chicago, Cincinnati, Cleveland and St. Louis
preferred stock, raised by a forgery to eighty shares, and two
Union Pacific first mortgage bonds of one thousand dollars
each, also formed part of the collateral. The lenders gave
their check for the twenty thousand dollars thus borrowed to
Mills, Robeson & Smith, and they indorsed it and deposited
it to their own credit in the Fourth National Bank. That
bank held the deposit upon an express contract with its cus-
tomer, which gave to it rights beyond those flowing from the
ordinary relation, and outside of the mere banker's lien. The
deposit was made on the afternoon of November 14th, 1890.
Previous to that date Mills, Robeson & Smith had borrowed
of the bank, first the sum of fifty thousand dollars, and next
the sum of five thousand dollars, giving in each case their note,
payable on demand, and certain collateral securities. The
special agreement between the parties added to such collateral
any balance of the customer's deposit accounts standing to
their credit on the books of the bank, and contained the fol-

lowing explicit provision : " The undersigned do hereby author-
ize and empower the said bank at its option, at any time, to
appropriate and apply to the payment of the above-named
obligations or liabilities, whether now existing or hereafter
contracted, any and all moneys now or hereafter in the hands
of the said bank, on deposit or otherwise, to the credit of or
belonging to the undersigned, whether the said obligations or
liabilities are then due or not due." On November 15, 1890,
the balance standing to the credit of the firm was a little more
than sixteen thousand dollars. On that day Mills, Robeson
& Smith failed and made a general assignment. On Novem-
ber 17th, which was the next business day thereafter, the
bank demanded payment of the loan, and in default thereof
applied the credit balance of the firm to the payment of its
debt, thereby so far canceling and extinguishing that liability.
This act the plaintiff resists, contending that the sixteen thou-
sand dollars was her money as proceeds of her stock stolen
from her by Smith, and which proceeds she was able to trace
into the thief's deposit account and sufficiently identify as her
own money. There is more or less of difficulty in that iden-
tification, and the subject has occasioned a large part of the
argument addressed to us, but need not now be discussed.
For the purposes of the decision, at least until we reach the
case of Mrs. Crabb, we may concede that the credit balance
was proceeds of the stolen stock and sufficiently identified, and
yet the opinion of the General Term will remain intact and
unanswered.

　　If Mills, Robeson & Smith, on receiving the check of
Ferris & Kimball, had at once collected it and turned it into
money, and then had paid that money to the bank in discharge
of their debt to it, and the bank had accepted that payment in
ignorance of the source from which the money had been
derived, and had surrendered the notes and discharged their
debtors' liability in entire good faith, the owner of the stolen
money would have had no right of recovery against the bank.
(*Justh* v. *Bank,* 56 N. Y. 478 ; *Stephens* v. *Board of Edu-
cation,* 79 id. 183.) This doctrine goes upon the ground that

money has no earmark ; that in general it cannot be identified as chattels may be, and that to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear. The rule is founded upon a sound general policy as well as upon that principle of justice which determines as between innocent parties upon whom the loss should fall under the existing circumstances. If, therefore, Smith had come with the money, and with it had paid his debt over the counter, the amount could not have been recovered by the plaintiff, although admitted to have been actual proceeds of the stolen certificate. I think the situation was not at all changed because the debtor came with Ferris & Kimball's check which the bank collected. If Smith had brought that and the bank had accepted it as cash or conditionally, upon its proving good, the result would have been the same. The debt would have been paid and the money become the absolute property of the bank. In *Goshen National Bank* v. *The State* (141 N. Y. 379) it was a draft which paid the debt and which the comptroller received and collected. Nor does it change the result that Smith deposited the check and did not at the moment direct its application upon the liability of the firm. He made the deposit under an existing specific contract by which Mills, Robeson & Smith consented and agreed that the bank might at any time apply it upon the existing liability. When it did so on the 17th of the month it acted with the written consent and authority of the firm, as completely effectual and operative as if the debtors on that day had personally directed the application to be made. The contract was a continuing direction, a daily consent, an agreed permission. The loan was a call loan, payment of which could be demanded on any day, and the option to make that demand and apply the credit balance was a part of the written agreement, and an essential and material stipulation of the contract of loan. I think the application of the deposit

account upon the debt, resting upon that continuing consent, had the same effect as if Mills, Robeson & Smith, without an assignment, had personally on that day directed the application, and so paid the debt. As against them and as against their assignee the application was in all respects lawful and effectual.

The recent case of *American Sugar Refining Co.* v. *Fancher* (145 N. Y. 552), which is pressed upon our attention, does not at all determine the present question. There the proceeds of the sugars obtained by fraud, remained in the hands of the insolvent's assignee without having been applied to the payment of debts. If the insolvent himself had applied those proceeds to some existing liability, or his assignee innocently and without notice had so paid them out, and the fund was sought to be wrested from the hands of the creditor paid, a very different question would have been raised, and one requiring a different solution.

Nor does the case of *Van Alen* v. *American Nat. Bank* (52 N. Y. 1) govern the one before us. There was there no claim by the bank upon the fund deposited. Concededly, they were bound to pay it over to the proper party, and the only question involved was who that proper party in truth was. The depositor was an agent, the deposit the money of his principal, impressed with a trust in favor of that principal, and the inquiry addressed to the court was whether the principal, for lack of privity, could enforce payment of the deposit to himself.

The rule we have applied is further resisted upon the ground that the application of the credit balance was made after the debtor's failure and assignment, and with knowledge of that fact on the part of the bank. The inference sought to be drawn is that the payment was not in good faith, but under circumstances sufficient at least to put the bank on inquiry. But business embarrassment or a general assignment does not warrant or suggest a presumption of fraud ; and certainly not of a theft producing moneys on deposit. The fact of the failure undoubtedly led to a call of the loan and a resort to the contract right. It was just such an emergency that the agree-

25

ment was framed to meet and against which it was to serve as a protection. The fact of the failure had not the least tendency to indicate that the deposit balance was the product of a larceny.

The further question in the case is over the right of Mrs. Crabb, which has been sustained. After the failure the whole credit balance of Mills, Robeson and Smith was first applied to the debt due to the bank. It was not enough to pay that debt. When it was wholly exhausted, so that no surplus was left, there still remained a sum due to the bank. Thereupon it resorted to its collateral, as it had a right to do. Among the securities pledged by the debtor firm were some belonging to Mrs. Crabb, which she had deposited for safe-keeping, and which Smith had appropriated for collateral. To these pledged securities the bank resorted, and sold most of them after the failure and after the credit balance had been fully exhausted. The result of that sale produced a surplus after completed payment of the bank's debt. The proceeds were credited by the bank after payment of their debt in full to the deposit account, and that surplus has been awarded to Mrs. Crabb. Obviously, no part of it could be said to be proceeds of plaintiff's stock. Those proceeds had been previously applied in payment of the bank debt and utterly exhausted. What remained was the collateral, and that produced the surplus, and such surplus was clearly the product of Mrs. Crabb's bonds, together with what is conceded to have been Fay's.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.